**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SCOTT STOUFFER, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | 2:20-cv-00133-RJC |
| vs. | ) ) ) | |
| UNION RAILROAD COMPANY, LLC., TRANSTAR, LLC, UNITED STATES STEEL CORPORATION and SMART TRANSPORTATION DIVISION, | ) ) ) ) ) | |
| Defendant. | ) ) | |

**<u>OPINION</u>**

Robert J. Colville, United States District Judge

Before the Court are two motions to dismiss:  First,  the  Motion to Dismiss (ECF No. 23) filed by the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD" or "the Union"), and second, the Motion to Dismiss (ECF No. 25) filed by Defendants Union Railroad Company, LLC ("the Railroad"), Transtar, LLC ("Transtar"), and United States Steel Corporation ("U.S. Steel") (collectively, the "Non-Labor Defendants"). Defendants' Motions have been fully briefed and are ripe for disposition.

**I.      Factual Background & Procedural History**

The allegations in the Amended Complaint (ECF No. 18) ("Am. Compl.") are as follows. Plaintiff, Scott Stouffer, brings this action for violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, *et seq*. ("ADEA"), as a collective action pursuant to 29 U.S.C. § 626(b), incorporating section 16(b) of the Fair Labor Standards Act, 29

U.S.C. § 216(b), on behalf of himself individually and on behalf of those similarly situated: i.e., all former employees of the Railroad who, at the time of their termination, were over age 40 and were improperly targeted for termination due to their age ("Senior Employees") (Counts I and II). Plaintiff also seeks certification under Fed. R. Civ. P. 23 to pursue class-wide claims against the Union for breaches of the duty of fair representation under the National Labor Relations Act, 29 U.S.C. § 158, *et seq.* ("NLRA") (Count III).

Plaintiff is an adult individual and a resident of the Commonwealth of Pennsylvania residing in Monongahela, Pennsylvania. (Am. Compl. ¶ 18).  On or about December 2, 2018, at the age of 41, Scott Stouffer was terminated from Railroad where he worked as a brakeman for more than 8 years.  (Am. Compl. ¶ 19).  The Railroad is a wholly owned subsidiary of Transtar, an entity engaged in the business of transporting raw materials and finished products for a variety of industries. (Am. Compl. ¶ 20).  The Railroad and Transtar are wholly owned subsidiaries of and operate in concert with U.S. Steel.  (Am. Compl. ¶ 21).

Plaintiff alleges that in or about May 2012, Defendants, led by the Railroad, the Railroad General Superintendent, Joel Hudson; U.S. Steel, U.S. Steel General Manager, Jonathan Carnes, U.S. Steel Managing Director, Malisa Sommers; and Transtar, initiated a pretextual scheme to terminate Railroad employees over age 40.  (Am. Compl. ¶ 2).  Defendants' scheme included forcing many Senior Employees to sign "last chance" agreements intended for employees with substance abuse problems, then manipulating the Railroad's demerits policy to issue a disproportionate number of demerits to Senior Employees so they could be, purportedly, fired for cause. (Am. Compl. ¶ 3).  Conversely, younger employees alleged to have committed the same or comparable offenses as Plaintiff and other Senior Employees routinely received no demerits, substantially less demerits, or were given an opportunity to expunge demerits from their records over time. (Am. Compl. ¶ 4).  In many cases, Senior Employees received a disproportionate number of

demerits for technical offenses the Railroad had historically exercised discretion to ignore. (Am. Compl. ¶ 5).  At their grievance hearings and/or arbitrations, Plaintiff and other Senior Employees lacked adequate representation and were overwhelmingly denied relief due to a concerted effort by the Defendants to fabricate or exaggerate the bases for their terminations. In some cases, the Railroad withheld potentially exculpatory evidence from Senior Employees without repercussion. Instead of fairly representing its union members as required by the collective bargaining agreement and applicable federal law, the Union was complicit in the scheme. (Am. Compl. ¶ 6).  Plaintiff and approximately 90 similarly situated former Railroad employees were victims of a discriminatory pattern and practice designed to weed out Senior Employees on the basis of their age. (Am. Compl. ¶ 7).

### Demerits Policy and Last Chance Agreement

The Railroad's demerits policy was created to provide a uniform structure to address employee rule and policy violations in a consistent and fair manner. According to the Railroad, the policy serves as a tool to assure rule compliance while offering employees the opportunity to correct poor behavior as well as to facilitate additional training where necessary. (Am. Compl. ¶ 23). The demerits policy is used to manage employee discipline for offenses such as tardiness, safety violations and misuse of carrier property. (Am. Compl. ¶ 24). Under the policy, managers may use informal coaching in lieu of formal discipline (demerits) for minor violations and have significant discretion with respect to the number of demerits assessed if they elect to issue demerits. (Am. Compl. ¶ 25).  If a manager elects to issue demerits, the maximum number of demerits that can be assessed for a single violation is 60. Employees who reach 100 demerits are subject to termination. (Am. Compl. ¶ 26).  The Railroad's demerits policy includes a provision for the removal of demerits from an employee's personnel records if the employee does not

accrue additional demerits in the 12, 24 and/or 36 months following his or her last offense. (Am. Compl. ¶ 27).

Beginning in or about May 2012, Transtar and the Railroad, led by Sommers, Carnes, and Hudson, began manipulating the demerits policy to ensure that Plaintiff and other Senior Employees could be fired for cause. (Am. Compl. ¶ 28).  As part of the scheme, the Railroad compelled many Senior Employees to sign "last chance" agreements the company had historically used to informally manage disciplinary action for employees with substance abuse problems. (Am. Compl. ¶ 29).

The last chance agreements were not sanctioned by the Collective Bargaining Agreement ("CBA") or the Railroad's demerits policy. Plaintiff and other Senior Employees had no opportunity to bargain the terms of the last chance agreements. (Am. Compl. ¶ 30). The last chance agreements were signed by Plaintiff and other Senior Employees as well as Defendants, the Railroad and the Union. (Am. Compl. ¶ 31).  The last chance agreements stated Plaintiff and other Senior Employees could continue working at the Railroad but were subject to immediate dismissal and waived all rights of appeal if accused of another offense. Contrary to the CBA, the last chance agreements expressly provided that the Union relinquished all rights to investigate or otherwise represent Plaintiff and other Senior Employees for future misconduct accusations. (Am. Compl. ¶ 32).

 Unlike the demerits policy, the last chance agreements contained no provision for the gradual removal of demerits for good behavior. Instead, they placed Plaintiff and other Senior Employees of the Railroad in a three year probationary period. (Am. Compl. ¶ 33). With the last chance agreements in place, it is alleged, the Railroad then targeted Plaintiff and other Senior Employees by applying the demerits policy against them in a manner inconsistent with the

company's history and inconsistent with its application of the same policy for younger (under age 40) employees. (Am. Compl. ¶ 34). It is further alleged that unlike Plaintiff and other Senior Employees, younger employees alleged to have committed the same or comparable violations routinely received no demerits, substantially less demerits or were given an opportunity to expunge demerits from their records after a certain amount of time lapsed. (Am. Compl. ¶ 35). In many cases, Senior Employees received a disproportionately high number of demerits after they were accused of committing highly technical offenses such as "stealing" four minutes of overtime or causing a train to move a few inches into a "red zone." (Am. Compl. ¶ 36). Plaintiff and other Senior Employees were the last group of employees with ties to the "Old Guard," a term colloquially used to refer to longtime employees who believed that working at the Railroad would provide a six-figure salary and full retirement benefits, including full pension benefits, and were afforded small perks such as the ability to sleep during "off-peak" work hours. Instead Plaintiff and other Senior Employees were subjected to a pattern and practice of discrimination on the basis of their age, and then were abruptly terminated. (Am. Compl. ¶ 37). Upon information and belief, Plaintiff and other Senior Employees have since been replaced by younger candidates.  (Am. Compl. ¶ 38).

### The Union: Smart-TD

Plaintiff and other Senior Employees were conductors, brakemen and/or switchtenders ("yardmen") exclusively represented by the Union pursuant to the CBA, effective November 1, 1943. (Am. Compl. ¶ 39).  Under the CBA, Plaintiff and other Senior Employees were entitled to an investigation, including a fair and impartial hearing, before they could be suspended or dismissed from service.  (Am. Compl. ¶ 40).  Upon information and belief, the Union retained or otherwise provided to Plaintiff and other Senior Employees the services of a law firm ("the Law Firm").  (Am. Compl. ¶ 41).  As part of this agreement the Union would bring attorney-representatives from the

Law Firm to regularly scheduled union meetings and introduce them as the "union attorneys." As a result, Plaintiff and other Senior Employees would seek counsel from those attorneys on a variety of work-related matters. (Am. Compl. ¶ 42).  When discussing work-related disputes, such as claims of age discrimination, Plaintiff and other Senior Employees were routinely advised by representatives from the Law Firm that there was nothing they could do for them. When pressed further, Plaintiff and other Senior Employees were told that they had no other recourse but to rely on the union for work-related disputes because "when you're in [the company's] ballpark, you have to work by their rules." (Am. Compl. ¶ 43).  When Plaintiff and other Senior Employees turned back to the union for help, the Union largely accepted the pretextual bases for Plaintiff and other Senior Employees' terminations rather than take steps to rebut the discriminatory application of the last chance agreements and demerits policy. (Am. Compl. ¶ 44).

In addition, the Union itself, or through the Law Firm, failed to inform Plaintiff and other Senior Employees that certain statute of limitations defenses may apply to their disputes and filing grievances would not toll application of those statute of limitations to their claims of discrimination. In fact, Plaintiff and other Senior Employees were specifically told they were forbidden from seeking other outside counsel until they had arbitrated their claims and exhausted any applicable appeals. (Am. Compl. ¶ 45).  As such, the Union, either itself, or through the Law Firm, ensured that Defendants' discriminatory application of the "last chance" agreements and demerits policy would not be investigated by any outside and/or independent agency. (Am. Compl. ¶ 46).

### Plaintiff's Termination

Plaintiff, Scott Stouffer, was born on June 5, 1977.  (Am. Compl. ¶ 47).  On June 7, 2010, Stouffer, was hired by the Railroad as a brakeman. (Am. Compl. ¶ 48).  Over his eight-year career with the Railroad, Plaintiff met all the necessary performance metrics and maintained a satisfactory demerits record.  (Am. Compl. ¶ 49). On March 22, 2017, Plaintiff was working a scheduled 10-hour shift when his supervisor asked him to punch out early without explanation. Due to his frustration

with the company's increasing reliance on remote operations and his supervisor's attitude towards

him, Plaintiff muttered "jagoff" under his breath as he walked away to clock out.  (Am. Compl. ¶ 50).

Despite accepting Plaintiff's immediate apology, Plaintiff's supervisor reported the incident and

Plaintiff was suspended from service later that night. (Am. Compl. ¶ 51).

The following week, Plaintiff met with Railroad management and his union representative,

Brad Elias, to address the incident. (Am. Compl. ¶ 52). During the meeting, Plaintiff was told he had

two options: 1) sign a last chance agreement; or 2) go to a hearing and get fired. (Am. Compl. ¶ 53).

Instead of defending Plaintiff by advocating for another alternative, Elias sided with the Railroad and

cited the rule Plaintiff was charged with violating. (Am. Compl. ¶ 54).  Given no other choice,

Plaintiff signed a last chance agreement on or about March 28, 2017 and was assessed 60 demerits.

(Am. Compl. ¶ 55).  Immediately after the last chance agreement was executed, Plaintiff was

subjected to a hostile work environment where, among other things, he was micromanaged by his

supervisor, denied meal periods, refused headlamp batteries and forced to wait unusually long

periods for routine work functions. (Am. Compl. ¶ 56). When Plaintiff brought the harassment to the

attention of the Union, Elias told him there was nothing they could do. (Am. Compl. ¶ 57).

On December 2, 2018, Plaintiff was working on a train driven by a younger (under age 40)

co-worker who caused the train to run through a switch. (Am. Compl. ¶ 58).  Plaintiff was charged

with multiple "cardinal rule" violations and immediately terminated. Conversely, Plaintiff's younger

co-worker who was principally responsible for the violation was assessed substantially less demerits

and kept his job with the Railroad.  (Am. Compl. ¶ 59).

When Plaintiff sought an explanation for his termination, the Railroad cited the last chance

agreement and refused to speak to him. (Am. Compl. ¶ 60).  When Plaintiff asked to see his younger

co-worker's statement about the incident, the Union claimed it did not have it and could not obtain it.

(Am. Compl. ¶ 61).   In a formal dismissal letter dated December 6, 2018, the Railroad reminded

Plaintiff that his last chance agreement forbade him, or anyone acting on his behalf, from challenging

his termination. (Am. Compl. ¶ 62).  Following his termination, the Railroad intentionally delayed the established protocol for the withdrawal of Plaintiff's retirement benefits. (Am. Compl. ¶ 63). At the time of his improper termination, Plaintiff was 41 years old. (Am. Compl. ¶ 64).

## II.   Legal Standard

A court must grant a motion to dismiss under Rule 12(b)(1) if it determines that it lacks subject matter jurisdiction over a claim. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). "Generally, where a defendant moves to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." *The Connelly Firm, P.C. v. U.S. Dep't of the Treasury*, No. 15-2695, 2016 WL 1559299, at *2 (D. N.J. Apr. 18, 2016) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000)).

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.  Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to
> relief.'"

*Id.*  (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

"[A]s a general matter, a district court ruling on a motion to dismiss may not consider

extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d

Cir. 1997). "However, an exception to the general rule is that a document integral to or explicitly

relied upon in the complaint may be considered without converting the motion to dismiss into

one for summary judgment." *Id.* (internal quotation omitted).

## III. Discussion

### A.  The Union's Motion to Dismiss (ECF No. 23)

The sole count naming the Union is Count III, which alleges the Union breached the duty

of fair representation under the National Labor Relations Act, 29 U.S.C. § 158, *et seq*.

("NLRA").  The Union attaches the CBA to its motion (ECF No. 24-1, Exhibit A), which

establishes the following.[1]  The union is the duly authorized representative for the purposes of

the Railway Labor Act ("RLA") of the crafts or classes of train service employees, including

brakemen such as plaintiff Stouffer, and is a representative as defined by Section 1 Sixth of the

Act, 45 U.S.C. § 151.  (ECF No. 24-1 at 84, Exhibit A at p. 72, CBA at Rule 46(a)).  The express

terms of the CBA provide that in accordance with the certifications of the National Mediation

---

[1] We find that the CBA is a document central to Plaintiff's claim, and accordingly, will consider the CBA in
deciding the motion to dismiss without converting the motion to a motion for summary judgment.

Board, "the General Committee of the Brotherhood of Railroad Trainmen (SMART-TD(T)), [i.e. the General Committee of Adjustment ("GCA") GO-969][2] shall represent employees in collective bargaining with the Company with regard to rates of pay, rules and working conditions.   (ECF No. 24-1 at 84, Exhibit A at p. 72, CBA at Rule 46(c)). The GCA GO-969 has interpretive authority over the agreement.  Grievances and disciplinary matters are handled locally and then at the GCA level.  (ECF No. 24-1 at 74-75, Exhibit A at p. 63-64, CBA at Rules 34, 36). The CBA provides:

### Rule 36 – Grievances, How Handled

Any grievances or controversies arising from application of the rules herein shall be taken up first by the Local Committee with designated officers, up to and including the Superintendent of Operations. In the event of failure on the part of the Local Committee to reach a satisfactory settlement with the designated officer representing Management, the matters in dispute will be referred to the General Committee of the Brotherhood of Railroad Trainmen (SMART-TD(T)), who will handle such disputes with the highest designated operating officer representing Management.

*Id.*  Grievances are not handled by the international union, named Defendant herein.  The SMART-TD International is located in North Olmsted, Ohio.  (Am. Compl. ¶ 22). The CBA was signed by a representative of the Railroad and the General Chairman of GO-969.  (ECF No. 24-1 at 3, Exhibit A, CBA at 3).  The discipline and appeals procedure is set forth in Rule 34 of the CBA; if the dispute remains unresolved once it has been appealed to the highest designated officer, it can be progressed to arbitration, in accordance with Section 3 of the RLA.  45 U.S.C. § 153.

---

[2] This body, it is argued, is separate and distinct from the named defendant herein, Smart-TD, which we have been referring to, for convenience sake, as "the Union").

**1. Subject Matter Jurisdiction**

The Union argues that this Court lacks jurisdiction to hear the duty of fair representation

("DFR") claim because plaintiff brings this action under Section 8(b)(1)(A) of the National

Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq.*, as amended in the Labor Management

Relations Act ("LMRA"), 29 U.S.C. § 185, *et seq.*  (Am. Comp. ¶¶ 8, 11).  Section 152(3) of the

NLRA, as amended by the LMRA, provides:

> (3) The term "employee" shall include any employee, and shall not be limited to
> the employees of a particular employer, . . . **but shall not include** any individual
> employed as an agricultural laborer, or in the domestic service of any family or
> person at his home, or any individual employed by his parent or spouse, or any
> individual having the status of an independent contractor, or any individual
> employed as a supervisor, or ***any individual employed by an employer subject to
> the Railway Labor Act, as amended from time to time***, or by any other person
> who is not an employer as herein defined.

29 U.S.C. § 152(3).  In *Masy v. New Jersey Transit Rail Operations, Inc.*, 790 F.2d 322 (3d Cir.

1986), employees of railroad brought breach of contract and breach of duty of fair representation

claims against the employer and the union charged with the duty of representing them. The

United States District Court for the District of New Jersey dismissed their claim against the

employer and granted union's motion for summary judgment, and employees appealed. The

plaintiffs had argued that section 301 of the LMRA provides the jurisdictional grant for their suit

against the employer.  On appeal, the United States Court of Appeals for the Third Circuit held

that "the district court, […], correctly held that the LMRA expressly excludes employees and

employers governed by the Railway Labor Act from its coverage. *Masy,* 790 F.2d at 325, citing

29 U.S.C. § 152(2), (3); *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co*., 394

U.S. 369, 376, 89 S.Ct. 1109, 1114, 22 L.Ed.2d 344 (1969). "Hence plaintiffs' federal claim

against NJT must rely on the Railway Labor Act." *Id.*  Based on the clear statutory exclusion

and precedential weight of *Masy,* the Union argues this Court lacks jurisdiction under the NLRA

to hear this matter because plaintiff has brought his DFR claim under the NLRA, which expressly excludes his employment from coverage.  29 U.S.C. § 152(3).

In response, Plaintiff tries to evade this statutory distinction, and argues the court has jurisdiction to hear duty of fair representation claims under the NLRA, insofar as he has alleged "SMART-TD violated its duty to fairly represent Plaintiff and other Senior Employees by accepting without question the pretextual bases for their terminations . . . This court thus has authority to adjudicate Plaintiff's breach of duty of fair representation claim *regardless of whether the Amended Complaint asserts the correct statutory basis for jurisdiction*."  (ECF No. 32 at 10-11, 14-15) (emphasis added).

This same argument was presented to another member of this court, in *Hammill v. Communication Workers of America,* C.A. 08-1476, 2009 WL 291166, *3-4 (W.D. Pa. Feb. 5, 2009). In that case, plaintiff sued his employer for breach of the collective bargaining agreement, and his employer, U.S. Airways, filed a motion to dismiss, arguing, *inter alia*, that the Court lacked subject matter jurisdiction on the grounds that the cases brought by employees of the air carrier are governed by the RLA because the LMRA expressly excludes entities covered by the RLA from the scope of cases governed by the LMRA.  The court agreed:

> Plaintiff appears to believe, then, that although the RLA would govern his dispute with his employer, the LMRA applies to his claims against his union. This is clearly incorrect. "Congress enacted the RLA to promote stability between labor and management ... and to, among other things, 'provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.'" . . . Numerous courts have applied the RLA in cases where the airline employee has sued his union for breach of its duty of fair representation.

*Hammill*, 2009 WL 291166, * 4 (citing cases).  The court then granted the motion to dismiss without prejudice on the grounds it did not have jurisdiction over Plaintiff's claims under the LMRA, holding the applicable federal statute is the RLA.[3]

Accordingly, the motion to dismiss Count III is granted to the extent Plaintiff relies on the inapplicable federal statute.

### 2.  Vicarious liability of the International Union

The Union further argues that even assuming this Court will permit a curative amendment to allow Plaintiff to cite to the appropriate statute so as to confer subject matter jurisdiction, it cannot be held vicariously liable for the actions or inactions of its subordinate bodies, here local GCA GO-969 as opposed to named defendant, SMART-TD, i.e. the international labor union. The Union argues the amended complaint fails to allege that the international union was aware of, or otherwise involved in, the alleged breach of the duty of fair representation, or had a duty under the CBA to file a grievance on Stouffer's behalf.  Rather, as the CBA states, the authority as exclusive bargaining representative lies with GCA GO-969. (ECF No. 24-1 at 76, Exhibit A at p. 63, CBA at Rule 36).

In *Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am*., 927 F.2d 1283, 1288 (3d Cir. 1991), the court upheld the grant of summary judgment in favor of the international union, stating that although the local union did not contest certain allegations:

> On the other hand, the International Union (encompassing also its officials) does vigorously challenge maintenance of a section 301 claim against it. Unlike the Local, it is not a party to the collective bargaining agreement and thus it claims it cannot be held liable for a breach of the duty of fair representation. The International argues that it cannot be held responsible for the unlawful conduct of its affiliated local unions unless it either instigated, supported, ratified, or encouraged such conduct, or it assumed a duty to the employer or union

---

[3] Despite the court's granting an opportunity to amend the complaint, Plaintiff did not seek leave of court to file an amended complaint the case was thereafter dismissed.

members to prevent such conduct. It claims that there is no evidence that it did any of these things.

The International's position finds strong support in the decision of the Supreme Court in *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 218, 100 S.Ct. 410, 414, 62 L.Ed.2d 394 (1979), where it held that the international union was not responsible for the local union's strikes when the international union did not instigate, support, ratify, or encourage any of the local union's work stoppages. Thereafter, this court applied *Carbon Fuel* in *Wilkes–Barre Publishing Co. v. Newspaper Guild of Wilkes–Barre, Local* 120, 647 F.2d 372, 382 (3d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982), holding that the international union was not liable to the employer because it was not a party to the collective bargaining agreement, and that the international's employees could be liable only if they induced a breach of contract by the local union.

With this precedent, it is clear that the allegations in the Amended Complaint do not state a claim to relief that is plausible on its face as to the international union.  The motion to dismiss will be granted in this regard, as Plaintiff has failed to allege that the international took part in the alleged violative conduct, and because the international union had no duty under the CBA to file a grievance.  Plaintiff has failed state a claim as to the Defendant named in the Amended Complaint.

Plaintiff has requested he be permitted to amend his complaint or enter into a stipulation substituting the party GCA GO-969 for SMART-TD.  (ECF No. 32 at 1.)   According to the Union, counsel expressly mentioned this error in their discussions prior to filing what was then their draft motion to dismiss the original complaint, prior to the Plaintiff's filing of the Amended Complaint, and Plaintiff should not be afforded an opportunity to further amend so as to cure the deficiencies in the Amended Complaint.  We will address the issue of granting leave to amend *infra*.

### 3. Sufficiency of the Allegations: Breach of Duty of Fair Representation

The Union next argues that even if the appropriate party were named, Plaintiff has failed to state a claim for which relief can be granted as to the breach of the duty of fair representation ("DFR"). First, to the extent he intends to bring a "hybrid" claim  Plaintiff has failed to allege the Railroad breached the CBA in dismissing him, which courts have held is a necessary prerequisite to state a claim against the Union in a hybrid DFR claim.  "In the 'hybrid' suit, the plaintiff will have to prove that the employer breached the collective bargaining agreement in order to prevail on the breach of duty of fair representation claim against the union, and vice versa." *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir.1993); *Johnson v. Laundry Workers LCL 141 & Agents*, 419 F. App'x 146, 148 (3d Cir. 2011).

Next, the Union argues Plaintiff has failed to state a claim for breach of the duty of fair representation. The court in *Ciarla v. United Government Security Officers of America,* C.A. No. 18-15787, 2019 WL 4566942, at *2 (D. N.J. Sept. 20, 2019) explained the necessary elements to such a claim:

> Notably, even if the union fails to proceed with a grievance or decides not to arbitrate a meritorious claim, a breach of the "duty of fair representation occurs only when [the] union's conduct toward a member of the collective bargaining agreement is arbitrary, discriminatory or in bad faith." *Walczak v. Interstate Brands.* No. 99-284, 2000 WL 1580109, at *7 (D.N.J Sept. 18, 2000) (quoting *Cole v. Pathmark of Fairlawn*, 672 F. Supp. 796, 804 (D.N.J Oct. 30, 1987)). A union's actions will only be deemed arbitrary if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Bakos v. Am. Airlines, Inc.*, 748 Fed. Appx. 468, 471-472 (3d Cir. 2018) (quoting *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). Such a "'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc*., 525 U.S. 33, 45-46 (quoting *Air Line Pilots Ass'n Int'l*, 499 U.S. at 67). To show discrimination on part of the union, "a plaintiff must adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Bakos*, 748 Fed. Appx. at 472 (quoting *Addington v. U.S. Airline Pilots Ass'n*, 791 F.3d 967, 984 (9th Cir. 2015) (internal quotation marks

omitted)). To show bad faith on part of the union, a plaintiff must put forth "a showing of fraudulent, deceitful, or dishonest action." *Id.* (quoting *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001)).

Here, Plaintiff has alleged few facts in support of the DFR claim. His allegations are largely labels and conclusions, or mere "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. He alleges the Union breached its DFR by "acting or failing to act in a manner that is arbitrary, discriminatory and/or in bad faith" and that is "conduct seriously undermined the integrity of the arbitral process by preventing Plaintiff and other Senior Employees from rebutting the discriminatory application of the Railroad's demerits policy and/or 'last chance' agreements." He further alleges the Union's conduct contributed to the erroneous outcome of the contractual proceedings." (Am. Comp. ¶¶ 87-92). What is lacking from the allegations is any factually specific support to the claim defendant's conduct was so far outside the wide range of reasonableness normally afforded to the Union, or facts to support adverse discriminatory motive.  Rather, the Amended Complaint does not provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id*. (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Thus, the motion to dismiss is granted in this regard.

### 4.  Statute of Limitations

Finally, the Union argues the Amended Complaint should be dismissed on the grounds of untimeliness.  The statute of limitations for a duty of fair representation claim against a union under the RLA is six months. 45 U.S.C. § 153;  *Miklavic v. USAir Inc*., 21 F.3d 551, 556 (3d Cir. 1994) ("Under the Railway Labor Act, the applicable limitations period for a DFR claim against a union is six months"); *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 304 (3d Cir. 2004); *Sisco v.*

*Consolidated Rail Corp*., 732 F.2d 1188, 1193–94 (3d Cir.1984).  The Amended Complaint

alleges two incidents: one disciplinary and one surrounding his termination. The relevant dates

are as follows.  The date Plaintiff muttered an insulting term , was reported and suspended from

service was March 22, 2017. (Am. Compl. ¶¶ 50, 51).  The following week, Plaintiff signed a

last chance agreement on March 28, 2017 and was assessed 60 demerits. (Am. Compl. ¶ 55).

The date relevant to his termination was December 2, 2018, when Plaintiff was working on a

train, and the train ran through a switch. (Am. Compl. ¶ 58).  That same date Plaintiff was

charged with multiple cardinal rule violations and immediately terminated. In a formal dismissal

letter dated December 6, 2018, the Railroad reminded Plaintiff that his last chance agreement

forbade him, or anyone acting on his behalf, from challenging his termination. (Am. Compl. ¶

62).  The Amended Complaint was filed on April 17, 2020. (ECF No. 18).

　　　　Hence, his failure to meet the statute of limitations is clear and the motion to dismiss will

be granted in this regard.  Plaintiff argues that the DFR claim commenced for tolling purposes

when he began the process of investigating his claims through counsel."  (ECF No. 32 at 8).

Plaintiff argues that the 6-month limitations period should be equitably tolled, noting that

because of  the Union's "active efforts to mislead Plaintiff, he was unaware of the existence of

his cause of action against the Union until well after he was terminated and began the process of

investigating his claims through his own counsel."  (Plaintiff's Response Brief, ECF No. 32 at

18).  We note that it is not entirely clear that equitable tolling is permitted under the RLA

because Congress expressly intended to encourage prompt resolution of railway claims.  *See*

*Colletti v. N.J. Transit Corp*., 50 Fed. Appx 513, 517 (3d Cir. July 31, 2002).

　　　　As an alternative to dismissal, Plaintiff again  proposes he be permitted to amend his

complaint or take discovery before the determination is made as to the timeliness of his claim.

**B.  Motion to Dismiss:  Non-Labor Defendants**

The Non-Labor Defendants seek dismissal of the Amended Complaint on numerous grounds.

### 1. Preemption and Preclusion by the Railway Labor Act

First, the Non-Labor Defendants argue that the RLA preempts and precludes all claims against them and thus, we lack subject matter jurisdiction.[4]  In addition to the CBA (attached to motion as Exhibit 1, ECF No. 25- 1), the Non-Labor Defendants rely on the Railroad demerit policy (attached to motion as Exhibit 2, ECF No. 25-2), the Waiver of Investigation/Last Chance Agreement entered into by Plaintiff Stouffer (attached to motion as Exhibit 3, ECF No. 25- 3), and Stouffer's termination letter (attached to motion as Exhibit 4, ECF No. 25-4).  The demerit policy provides, inter alia, that for insubordination (first offense) a worker is subject to dismissal (ECF No. 25-2).  While under the CBA Stouffer was provided an opportunity to have a formal investigation and to proceed to a grievance under the CBA, he instead chose to enter into the last chance agreement and agreed to being assessed sixty demerits and a three-year probationary period.  (ECF No. 25-3).  He waived his right to a formal investigation and "any subsequent appeal in accordance with the CBA." (ECF No. 25-3). It was while he was on this probationary period that Plaintiff was terminated due to violating "cardinal rules."  We note that the Union Railroad Demerit Policy states it is "intended to provide a uniform structure to address rule and policy violations in a consistent and fair manner."  (ECF No. 25-2 at 2).  It provides:

---

[4] In *Norris*, the Supreme Court noted that state-law claims that require interpretation of a CBA would be "preempted," while claims based on federal law would be "precluded," and stated that the principles governing both concepts are the same. 512 U.S. at 259, n.6. Federal courts have used the terms "preclusion" and "preemption" interchangeably and likewise equated the two concepts. Preclusion and preemption are based on the same idea -- that federal labor law should control the issues in a case that requires interpreting a CBA -- but the former affects federal statutes while the latter affects state statutes. *See Sturge v. Northwest Airlines, Inc.*, 658 F.3d 832, 2011 WL 4634223, *8 (8th Cir. Oct. 7, 2011); *Brown v. Ill. Cent. R.R.,* 254 F.3d 654, 664 (7th Cir. 2001), *cert. denied*, 534 U.S. 1041 (2001)

The Policy shall not serve to amend, replace or modify the terms of any existing Collective Bargaining Agreement and employees shall retain all rights currently afforded them under such agreements.

In *Int'l Ass'n of Machinists & Aerospace Workers Dist. Loc. Lodge 1776 v. Jackson*, No. CIV.A. 09-150, 2010 WL 597247, at *3 (E.D. Pa. Feb. 19, 2010) the court explained when the RLA preempts and precludes claims:

The RLA governs three different types of disputes: "representation disputes," "major disputes," and "minor disputes." A "representation dispute" deals with "the selection of collective-bargaining representatives." *Independent Ass'n of Continental Pilots v. Continental Airlines*, 155 F.3d 685,  690 (3d Cir. 1998). This type of dispute is under the exclusive jurisdiction of the RLA. *Id*. at n. 3. A "[major dispute] relates to disputes over the formulation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

"A minor dispute is a dispute over the interpretation or application of existing collective bargaining agreements." *United Transp. Union v. Conemaugh & Black Lick R.R. Co*., 894 F.2d 623, 628 (3d Cir.1990). A claim is a minor dispute if it, "implicate[s] practices, procedures, implied authority, or codes of conduct that are part of the working relationship." *Fry v. Airline Pilots Ass'n., Intern*., 88 F.3d 831, 836 (10th Cir.1996).

Importantly, and for purposes of the motion before this Court, minor disputes must be kept out of the courts and under the exclusive jurisdiction of an arbitration board. *See Independent Ass'n. of Continental Pilots*, 155 F.3d at 691 (citing *Union Pacific R.R. Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978)). When a claim is "inextricably intertwined" or "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," the claim is preempted. *Wall v. Americold Corp*., 1997 WL 431006, at *2 (E.D. Pa. July 15, 1997) (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 & 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)).

2010 WL 597247 *3.

Thus, a claim is preempted by the RLA when it "is 'inextricably intertwined' or 'substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract . . .'" *Int'l Ass'n of Machinists and Aerospace Workers Dist. Local Lodge 1776 v.*

*Jackson,* No. 09-150, 2010 WL 597247 at *3 (E.D. Pa. Feb. 19, 2010) (citations omitted). Claims

must be dismissed if they require "an examination into, and interpretation of, the terms of the

[CBA] between [a plaintiff's] Union and the [employer]." *Malobabich v. Norfolk S. Corp*., No.

2:11-CV-112, 2011 WL 1791306, at *2 (W.D. Pa. May 10, 2011) (quoting *Blackwell v. Am.

Airlines, Inc*., No. 98 C 6856, 2003 WL 22159412, at *2 (N.D. Ill. Sept. 17, 2003)).

 Plaintiff here claims that the defendants' actions had discriminatory or retaliatory

motives;[5]  Non-Labor Defendants argue that Plaintiff's claims were inextricably intertwined

with, and substantially dependent upon analysis of the CBA, and therefore, this court lacks

subject matter jurisdiction.  The central case relied upon by the Non-Labor Defendants is

*Malobabich v. Norfolk Southern Corp*., No. 2:11-cv-112, 2001 WL 1791306 (W.D. Pa. May 10,

2011). Plaintiff's complaint alleged violations of the ADEA, a parallel age discrimination claim

under the Pennsylvania Human Relations Act, and the tort of intentional infliction of emotional

distress. Defendant employer filed a motion to dismiss, which the court granted on the grounds

of lack of subject matter jurisdiction:

>  As an initial matter, the Court must ensure that it may exercise subject-matter
> jurisdiction. In this case, the jurisdictional analysis requires harmonization of two
> federal statutes. The ADEA, 29 U.S.C. § 626(c)(1), provides that individuals who
> allege age discrimination may bring an action in federal court to obtain legal or
> equitable relief. On the other hand, the Railway Labor Act ("RLA"), 45 U.S.C. §
> 151a et seq., establishes arbitration boards which have exclusive jurisdiction to
> resolve disputes over the interpretation or application of CBAs in the railroad
> industry.
>
>  In determining whether subject-matter jurisdiction exists, the Court is not limited
> to the allegations of the Complaint. Rather, the Court may also consider
> extraneous evidence submitted by the parties. *Blackwell v. American Airlines,
> Inc.*, 2003 WL 22159412 *2 (N.D. Ill.2003) (citations omitted). Accordingly, the
> Court takes judicial notice of the existence of the CBA between NS and the

---

[5] As will be addressed infra, Stouffer offers the conclusory allegation, without any factual support, that his termination for demerits and a potentially-disastrous safety violation was part of "a pretextual scheme to terminate [the Railroad] employees over age 40" to "on the basis of their age" in violation of the ADEA. (Am. Compl. ¶¶ 2, 7).

Union, and the seniority rules contained therein. Notably, Malobabich has not challenged the authenticity of the CBA, and indeed, counsel for Plaintiff has explained that he "is not alleging that Defendant violated the CBA."

*Id.*, 2011 WL 1791306, at *1.   The court, adopting a broader preemption/preclusion rule, found it lacked jurisdiction, noting:

> The age discrimination claims are not wholly independent from the CBA. Malobabich was hired as a 56–year–old student electrician and he does not dispute that the younger electricians had more seniority. His claim is adverse to the CBA seniority rights of his coworkers. *Malobabich is not challenging the motives of NS, but instead, he facially challenges the CBA seniority rules as violative of the ADEA.* In other words, he contends that NS committed age discrimination because it abided by the CBA seniority rules. Clearly, this dispute is inextricably intertwined with and requires interpretation of the CBA.
>  In addition, Congress has recognized that Malobabich's ADEA claim must be analyzed in conjunction with the CBA. Pursuant to the ADEA, 29 U.S.C. § 623(f)(2)(A): "It shall not be unlawful for an employer ... to observe the terms of a bona fide seniority system that is not intended to evade the purposes of this chapter." This provision not only casts doubt on whether Malobabich can ultimately succeed on the merits of his claims, it also reflects the intent of Congress that his age discrimination claim be evaluated in the context of the seniority rules set forth in the CBA which is governed by the RLA. In *Brown*, 254 F.3d at 668, the United States Court of Appeals for the Seventh Circuit held that ADA claims were precluded because interpretation of the CBA seniority provisions could conclusively dispose of the claim. In sum, the Court concludes that it lacks subject-matter jurisdiction over this case.

*Id.*, 2011 WL 1791306, at *3 (citing *Brown v. Illinois Central R.R.*, 254 F.3d 654 (7th Cir. 2001) (emphasis added).

Here, Stouffer alleges his discipline and termination was part of "a pretextual scheme to terminate [the Railroad] employees over age 40" "on the basis of their age" in violation of the ADEA. (Am. Compl. ¶¶ 2, 7).   Unlike *Malobabich*, he challenges the motives of the Non-Labor Defendants in taking adverse action, in violation of rights or obligations that exist independently of the CBA. The allegations here are not intertwined with the Railroad's application of the demerits, discipline, and termination rules and policies under the CBA.   His claim does not

involve interpretation of the CBA, which makes no reference to the demerits policy.  Rather, he challenges the application of the last chance agreements and demerits policy, alleging the defendants applied them in a manner adverse to Senior Employees but advantageous to younger employees.

For the reasons stated herein, Stouffer's claims are not barred by the RLA and the motion to dismiss will be denied to the extent it relies upon Federal Rule of Civil Procedure 12 (b)(1).

**2. Transtar and U.S. Steel: "Employers" under the ADEA**

Under the ADEA, only employers may be held liable.  29 U.S.C. § 623*; Lewis v. Vollmer of America*, No. 05-1632, 2008 WL 355607, *1 (W.D. Pa. Feb. 7, 2008).  Non-Labor Defendants argue that Defendants Transtar and U.S. Steel must be dismissed because they did not employ him.  The Amended Complaint alleges Stouffer was employed by the Railroad.  (Am. Compl. ¶ 19).  More broadly, Stouffer alleges that the Railroad, Transtar, and U.S. Steel cooperated through their leaders to "initiate a pretextual scheme to terminate Union Railroad employees…" (Am. Compl. ¶ 2).  There are no factual allegations to support a claim that Transtar or U.S. Steel are an employer.  In response to this argument, Plaintiff argues we should apply a "joint employer" analysis, despite the fact that the Amended Complaint does not mention such a theory.   As alleged, Stouffer has failed to state a claim as to Transtar and U.S. Steel, and accordingly, the motion to dismiss will be granted as to Counts I and II with respect to Transtar and U.S. Steel.

In his brief in opposition, Plaintiff seeks leave to amend the Amended Complaint as to this claim.  We will address this request *infra.*

### 3.  Count II:  Disparate Impact and the ADEA

Non-Labor Defendants argue that, even if they can be held liable as joint employers, Count II, as pled, must be dismissed because disparate impact claims are not cognizable under the ADEA.  They contend that when disparate impact and disparate treatment are both alleged under the ADEA, "it is disparate treatment that is viewed by a majority of courts as the appropriate fit for the allegation because, in disparate treatment claims, the plaintiff's age must be the determining factor, which is consistent with the ADEA; whereas disparate impact claims are nearly always in tension with the ADEA because disparate impact theory does not mandate consideration or even awareness of age."  (ECF No. 34 at 10).   Yet court's have permitted disparate impact cases to proceed under the ADEA.

> "To state a *prima facie* case for disparate impact under the ADEA, a plaintiff must (1) identify a specific, facially neutral policy, and (2) proffer statistical evidence that the policy caused a significant age-based disparity." *Karlo*, 849 F.3d at 69. "[T]he employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 280 (D. Conn. 2009) (quoting *Smith*, 544 U.S. at 241, 125 S.Ct. 1536). "[I]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Id.* (quoting *Smith*, 544 U.S. at 241, 125 S.Ct. 1536). Once a plaintiff establishes a *prima facie* case, an employer can defend by arguing that the challenged practice was based on reasonable factors other than age. *Karlo*, 849 F.3d at 69 (citing 29 U.S.C. § 423(f)(1); 29 C.F.R. § 1625.7).

*Horowitz v. AT&T, Inc*., No. CV174827BRMLHG, 2019 WL 8275258, at *7 (D. N.J. Aug. 29, 2019).  Yet  "where the employment practices supporting the Plaintiff's disparate impact claims are the employment practices supporting the disparate treatment claims,' they should be dismissed because 'it provides a means for the Plaintiff to avoid establishing the subjective intent requirement for her disparate treatment claims.'"  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69 (3d Cir. 2017) (quoting *Zawacki*, 628 F. Supp. 2d at 281 n.4).  "Plaintiff must do

more, therefore, than simply mimic the facts asserted in support of her disparate treatment claim. *Horowitz v. AT&T, Inc.*, C.A. 17-4827, 2019 WL 8275258 *8 (D. N.J. August 29, 2019).

Plaintiff argues he has sufficiently alleged the neutral last chance agreements and demerits policies have had a discriminatory and adverse impact on Plaintiff and other Senior Employees over the age of 40.  The crux of the claim is that there was a "scheme" to target senior employees, and that the Union's demerits policy is facially neutral.  Plaintiff alleges the actual application and enforcement of the demerits policy and last chance agreements resulted in a statistically significant disparity  in the number and/or nature of demerits issued to Plaintiff and other Senior Employees.  Because the information required to develop the statistics to support a disparate impact claim is theoretically in the unique control of the defendants, at this juncture, there are plausible grounds to infer culpable conduct, and we find plaintiff has adequately pled a statistically significant disparity.  *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2nd Cir. 2010).

At this juncture, as plead, Plaintiff has set forth a viable ADEA disparate impact claim, which after discovery, may or may not survive.  Accordingly, the motion to dismiss Count II will be denied.

### 4. Collective Action

Non-Labor Defendants further argue that Stouffer pleads no facts to support a commonality for purposes of a collective action.  They argue that Plaintiff  fails to plead facts that give reason to collectively tie together the various demerits and terminations of a group, and thus he fails to state a claim and should be dismissed under Rules 12(b)(6) and/or  should be stricken pursuant to Federal Rule of Civil Procedure 12(f).

In most federal class actions, the issues of joinder among, and notice to, potential class members are governed by Federal Rules of Civil Procedure 23. However, class actions brought under the ADEA are governed by Section 7(b) of the ADEA, 29 U.S.C. § 626(b), which incorporates certain select provisions of the FLSA, 29 U.S.C. §§ 201 et seq., to establish the "powers, remedies, and procedures" by which the ADEA is to be enforced. One of these provisions, 29 U.S.C. § 216(b), provides for class actions as follows:

> An action to recover the liability prescribed .... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Therefore, ADEA class actions may only proceed under 29 U.S.C. § 216(b), and not under Rule 23. *See, e.g., Lusardi v. Xerox Corp*., 99 F.R.D. 89, 92 (D.N.J. 1983); *LaChapelle v. Owens–Illinois, Inc*., 513 F.2d 286, 289 (5th Cir. 1975).

The Court finds the motion is premature at this stage. *Zavala v. Wal–Mart Stores Inc*., 691 F.3d 527, 537 (3d Cir. 2012) (stating that factors relevant to whether plaintiffs are similarly situated include, but are not limited to "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment").  We may reconsider at a future date whether the case should be permitted to proceed as a collective action upon consideration of a motion to conditionally certify the class. Accordingly, the motion to dismiss is denied with respect to the collective action portion of the Amended Complaint.

**5. <u>Leave to amend</u>**

As set forth *supra*, the Amended Complaint lacks specificity in numerous respects, and Plaintiff has responded to these inadequacies with a request to be granted leave to amend, although he has not filed a motion requesting such relief.  Defendants have articulated that Plaintiff has previously been given an opportunity to address errors and omissions in the Amended Complaint.  The procedural history of the case bears that out.  On February 12, 2020, the Non-Labor Defendants filed a Stipulation for Extension of Time to Answer, to which then-Plaintiff Marshal agreed.  (ECF No. 9).  On February 18, 2020, the Union filed a Stipulation for Extension of Time to answer, again, agreed to by Plaintiff.  (ECF No. 15).  On April 2, 2020, all parties filed a joint motion to modify filing deadlines, in which counsel represented that Non-Labor Defendants had conducted a conference with Plaintiff's counsel for the purposes of holding a meet and confer discussion prior to the filing of a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6).  (ECF No. 16). According to the joint motion, Plaintiff's counsel stated he intended to file an amended complaint, "and because such filing would moot any Rule 12(b) motions directed to the original complaint in this matter" the parties agreed Plaintiff may file an amended complaint.  (ECF No. 16 at 2).  Hence, Plaintiff, who is represented by counsel, had been afforded an opportunity to amend the original complaint so as to correct any legal deficiencies with respect to arguments put forth by defendants.  Thus, the Union argues, "Plaintiff here had an opportunity to cure this deficiency when it was expressly pointed out to his counsel prior to the filing of his Amended Complaint, but inexplicably neglected to do so. His belated plea for the court to correct his own error should be rejected, and Defendant's Motion should be granted without leave to amend."  (ECF No. 38 at 3).

Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend a pleading "once as a matter of course at any time before a responsive pleading is served." A motion to dismiss for failure to state a claim must be made "before pleading if a further pleading is permitted." Fed. R. Civ. P. 12(b). Thus, in the typical case in which a defendant asserts the defense of failure to state a claim by motion, the plaintiff may amend the complaint once "as a matter of course" without leave of court. See 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[5], at 12–76 (3d ed.1999) (quoting Fed. R. Civ. P. 15(a)).

After amending once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court has instructed that although "the grant or denial of an opportunity to amend is within the discretion of the District Court, ... outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1434 (3d Cir.1997); *Lorenz v. CSX Corp*., 1 F.3d 1406, 1413–14 (3d Cir. 1993). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. *Burlington*, 114 F.3d at 1434. In assessing "futility," the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id*.; 3 Moore's Federal Practice, supra § 15.15[3], at 15–47 to –48 (3d ed. 2000).

If a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the

deficiency.  Accordingly, out of an abundance of caution, and in the interest of justice, we will permit Plaintiff to file a Second Amended Complaint.

**IV. Conclusion**

For the reasons discussed above, the Court will grant the motions to dismiss without prejudice.  An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: March 30, 2021

cc: All counsel of record via CM-ECF