IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT STOUFFER, individually and on behalf of himself and all others similarly situated, | CIVIL ACTION NO. 2:20-CV-00133-RJC |
| | ADEA COLLECTIVE ACTION |
| Plaintiff, | |
| v. | |
| UNION RAILROAD COMPANY, LLC, TRANSTAR, LLC, UNITED STATES STEEL CORPORATION, and SMART TRANSPORTATION DIVISION, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiff Scott Stouffer, on behalf of himself and all others similarly situated, files this action for violations of the Age Discrimination in Employment Act ("ADEA" – 29 U.S.C. §§ 621 et seq.) by United States Steel Corporation, Transtar, LLC, and Union Railroad Company, LLC (collectively "U.S. Steel Defendants").

## PRELIMINARY STATEMENT

1.      In 2013, the U.S. Steel Defendants faced a financial reckoning that threatened the way the companies had operated for decades.

2.      During this period, the U.S. Steel Defendants were forced to decide between making substantive changes to their core businesses or undergo cost-cutting measures.

3.      Publicly, the U.S. Steel Defendants marketed a plan known as the Carnegie Way, which was a grand attempt by the U.S. Steel Defendants to transform the companies during a downturn in the steel industry.

4.      The Carnegie Way has since become the focus of numerous lawsuits, which depict the plan as nothing more than a charade.

5.      It now appears that the Carnegie Way was nothing more than a series of extreme, cost-cutting measures which sought to reduce debt and expenses by any means possible.

6.      This action focuses on the U.S. Steel Defendants' attempt to reduce expenses by systematically and illegally eliminating employees who were part of the U.S. Steel Defendants' railroad transportation business and 40 years or older at the time of their firing ("Senior Employees").

## THE PARTIES

7.      Plaintiff Scott Stouffer is an adult individual who resides in Monongahela, Pennsylvania.

8.      Defendant United States Steel Corporation ("U.S. Steel") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Pittsburgh, Pennsylvania.

9.      Defendant Transtar, LLC ("Transtar"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Pittsburgh, Pennsylvania.

10.     Transtar is comprised of seven railroad entities: Delray Connecting Railroad Company, Fairfield Southern Company, Gary Railway Company, Lorain Northern Company, Texas & Northern Railway Company, The Lake Terminal Railroad Company, and Union Railroad Company.

11.     As part of its operations, Transtar exerts influence over and controls the day-to-day operations of the seven railroad companies listed above. Transtar also provides human

resources services to the seven railroad companies from its headquarters located in Pittsburgh, Pennsylvania.

12.     Defendant Union Railroad Company, LLC ("Union Railroad") is a corporation organized and existing under the laws of the State of Delaware and shares the same principal place of business as Transtar in Pittsburgh, Pennsylvania.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that Stouffer's claims arise under the laws of the United States and Stouffer seeks redress for violations of federal laws.

14.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that it is between citizens of different states, and the amount in controversy exceeds the sum of $75,000.00.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b)(2) as a substantial part of the events or omissions giving rise to Stouffer's claims occurred in this district.

## FACTUAL BACKGROUND

**A.     U.S. Steel's integrated steelmaking model and
        its centralized control over all lines of business**

        **The integrated steelmaking model and the need for railway operations**

16.     U.S. Steel was founded in 1901, and at one time, was the largest corporation in the world and the largest steel producer.

17.     Today, U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe. U.S. Steel supplies

customers throughout the world, primarily in the automotive, consumer, industrial, and oil country tubular goods markets.

18.     As an integrated steel producer, U.S. Steel owns and operates numerous lines of business as part of its steel-production operations. One of the business lines that U.S. Steel owns and operates is railroad transportation.

19.     Railroad operations are vital to U.S. Steel's core business as the company uses its railways to transports raw materials; provide in-plant transportation and movement of semifinished steel; and move finished product to its destination.

20.     A large part of U.S. Steel's prior success involved controlling and managing all its lines of business. However, during a severe downturn in the steel industry during the 1980s, U.S. Steel went through a financial restructuring which impacted the railroad transportation business.

21.     In 1988, U.S. Steel created Transtar as a holding company for its railroad transportation business and as part of the company's financial restructuring process.

22.     However, even after this financial restructuring move, U.S Steel's relationship with Transtar and its railroad transportation business remained the same: Transtar and the railroad transportation business continued to operate under the direction of U.S. Steel and as part of U.S. Steel's integrated steelmaking process.

23.     Currently, Transtar is wholly owned by U.S. Steel and the following companies comprise U.S. Steel's railroad transportation business (i.e., Transtar): Delray Connecting Railroad Company, Fairfield Southern Company, Gary Railway Company, Lorain Northern Company, Texas & Northern Railway Company, The Lake Terminal Railroad Company, and Union Railroad Company (collectively "U.S. Steel Railroads").

**U.S. Steel's control and influence over
<u>Transtar, Union Railroad, and the other U.S. Steel Railroads</u>**

24.     The parent-subsidiary relationship between U.S. Steel, Transtar, and the U.S.

Steel Railroads is significant to this action because Transtar and the U.S. Steel Railroads are

subsidiary companies who are unilaterally dependent upon U.S. Steel.

25.     For U.S. Steel, the nature of the integrated steelmaking process ensures that it

retains control over and authority over Transtar and the U.S. Steel Railroads because it controls,

among other things, assignment of management personnel, workplace resources, finances, and

the organizational structure of the companies.

26.     Because of the nature of this parent-subsidiary relationship, U.S. Steel and

Transtar act as joint employers for many employees of the U.S. Steel Railroads, including

Plaintiff Scott Stouffer.

**a.     <u>Shared management</u>**

27.     U.S. Steel maintains control and authority over Transtar and the U.S. Steel

Railroads by staffing Transtar's executive ranks with U.S. Steel managers and requiring the U.S.

Steel Railroads to report to those same, U.S. Steel managers.

28.     Through this hierarchy, U.S. Steel is able to directly control and influence the

day-to-day operations of Transtar and the U.S. Railroads.

29.     Transtar currently lists two executives on its website: Jonathan Carnes ("General

Manager") and Mark Furry ("General Council" [sic]). Transtar's Corporate Directory,

https://www.transtarrail.com/uss/portal/home/about-us/corporate-directory (last visited April 28,

2021).

30.     During the relevant period of these claims, Carnes was Managing Director of U.S. Steel Logistics and General Manager of Transtar while Furry was Senior Counsel, Assistant General Counsel, and Associate General Counsel for U.S. Steel.

31.     The primary employer for both Carnes and Furry was U.S. Steel, and that is the company that both Carnes and Furry had a fiduciary duty to.

32.     The position of General Superintendent is the top management position at each of the U.S. Steel Railroad companies. However, the General Superintendent reports directly to the General Manager of Transtar. In turn, the General Manager of Transtar reports directly to U.S. Steel's executives, who determine the purpose, direction, and goals of Transtar and the U.S. Railroads.

### b.     U.S. Steel's control over workplace resources

33.     U.S. Steel's control of Transtar and the U.S. Steel Railroads begins with the employee screening process as all jobs for Transtar and the U.S. Steel Railroads are posted on U.S. Steel's website. U.S. Steel personnel are also responsible for the initial screening of Transtar and U.S. Steel Railroads' job applicants through use of U.S. Steel's BrassRing website.

34.     At work, human resources and personnel-related issues are handled by two Transtar employees: Lauren Hart (Transtar's Manager of Labor Relations) and Ursula Lesic (Transtar's Manager of Human Resources).

35.     As Labor Relations Manager, Hart is responsible for the following: counseling managers from all the U.S. Steel Railroads on labor and employment law issues, acting as a representative of Transtar and/or the U.S. Steel Railroads on all labor-related issues, defending Transtar and/or the U.S. Steel Railroads before state and federal agencies, and negotiating on

behalf of U.S. Steel, Transtar and/or the U.S. Steel Railroads during collective bargaining agreement ("CBA") negotiations.

36.    For union employees at Transtar and the U.S. Steel Railroads, the terms and conditions of employment are established through a CBA. It is believed that whenever Hart, as Labor Relations Manager, negotiates on behalf of Transtar and/or the U.S. Steel Railroads, she does so based on parameters set by U.S. Steel. It is also believed that whenever there is a crucial dispute over a CBA provision, U.S. Steel directs Hart or other Transtar representatives on how to respond.

37.    As Human Resources Manager, Lesic is responsible for managing all human resources-related functions at Transtar and the U.S. Steel Railroad.

38.    Hart and Lesic report directly to Transtar's General Manager, Jonathan Carnes. Carnes, as noted above, reports directly to U.S. Steel's executives.

### c.    Public reporting of U.S. Steel's operating structure

39.    U.S. Steel's control over Transtar and the U.S. Steel Railroads is reflected in the 10-K Reports that U.S. Steel filed form 2011-2014:

> "U. S. Steel owns the Gary Railway Company in Indiana; Lake Terminal Railroad Company and Lorain Northern Company in Ohio; Union Railroad Company in Pennsylvania; Fairfield Southern Company, Inc. located in Alabama; Delray Connecting Railroad Company in Michigan and Texas & Northern Railroad Company in Texas; all of which comprise U. S. Steel's transportation business." [emphasis added]

40.    From 2015-2018, U.S. Steel wrote a substantially similar description about its railroad operations in its 10-K Report:

> "U. S. Steel owns the Gary Railway Company in Indiana, Lake Terminal Railroad Company and Lorain Northern Company in Ohio, Union Railroad Company, LLC in Pennsylvania, Fairfield Southern Company, Inc. in Alabama, Delray Connecting Railroad Company in Michigan and Texas & Northern Railroad Company in Texas. These entities comprise U. S. Steel's transportation business." [emphasis added]

41.     It was not until U.S. Steel's 2019 10-K Report that the company adjusted its description of its transportation business, stating "U. S. Steel owns the following railroads through its transportation subsidiary, Transtar…"

42.     Despite the change in phrasing in U.S. Steel's 2019 10-K Report, U.S. Steel had and continues to have a financial incentive to make decisions which directly impact the terms and conditions of employment for all individuals who work in its railroad transportation business, which includes employees of Transtar and Union Railroad.

> **d.     U.S. Steel's operating structure creates a**
> **joint-employer relationship between the U.S. Steel Defendants**

43.     Recent actions by U.S. Steel affirm the company's control over Transtar, Union Railroad, and the other U.S. Steel Railroads, and reflects the joint-employer relationship between those companies.

44.     In 2020, U.S. Steel went through a restructuring which resulted in the layoff of numerous employees of the U.S. Steel Railroads.

45.     Each employee of the U.S. Steel Railroads who was laid off was

a.      Provided a letter from a U.S. Steel Human Resources Representative, on U.S. Steel letterhead, indicating that their employment was terminated due to a restructuring of U.S. Steel;

b.      Notified of an opportunity to apply for U.S. Steel's supplemental unemployment benefit program;

c.      Apprised of the status of their existing benefits; and

d.      Required to sign a release of claims against U.S. Steel if they agreed to accept post-employment benefits.

46.     Each employee of the U.S. Steel Railroads who was laid off was also provided with a document pursuant to the Older Worker Benefit Protection Act ("OWBPA"). The OWBPA Notice stated that U.S. Steel decided to implement a reduction in force due to poor

business conditions; listed "Transtar & Logistics" as a department of U.S. Steel; and provided a list of individuals who were "selected for layoff or termination" and who were "not selected for layoff or termination." A copy of the OWBPA Notice is attached as Exhibit A.

47.     The OWBPA Notice was created by U.S. Steel and contained decisional unit information comprised of employees from Transtar, Delray Connecting Railroad Company, Fairfield Southern Company, Gary Railway Company, Lorain Northern Company, Texas & Northern Railway Company, The Lake Terminal Railroad Company, and Union Railroad. See Exhibit A.

48.     U.S. Steel's OWBPA Notice reflects the true operating structure of the company, the dependency of Transtar and the U.S. Steel Railroads on U.S. Steel, and the existence of a joint-employer relationship between U.S. Steel, Transtar, and the U.S. Steel Railroads.

**B.      Changes in the steel industry exacerbate the cost of running a railroad**

      **Post-employment benefit costs unique to Transtar and the U.S. Steel Railroads**

49.     Running a railroad presents numerous challenges, and in 2013, U.S. Steel viewed the looming costs of employing an aging workforce as its biggest challenge.

50.     Employees of Transtar and the U.S. Steel Railroads are provided with unique benefits, which include access to pensions and other post-employment benefits. Some of these post-employment benefits are mandated by federal law.

51.     In the 1930s, a series of federal laws were passed, setting up a retirement system for railroad workers to be administered by the Federal Government ("Railroad Retirement Act" or "RRA").

52.     The RRA has since been amended and now provides a variety of employment and post-employment benefits to railroad workers based on an employee's years of service and earnings.

53.     The RRA benefits are funded though two tiers of employer and employee taxes. Tier I taxes are coordinated with social security tax rates and increase automatically when social security taxes rise. Employees and employers both pay Tier I taxes, which in 2021, are set at 7.65% on a maximum of $142,800 in annual taxable earnings. Tier II taxes are established by the Railroad Retirement Board, and in 2021, are 4.90% for employees and 13.10% for employers on a maximum of $106,200 in annual taxable earnings

54.     If an employee qualifies for Tier I and Tier II benefits, they are eligible to receive the following through the RRA: retirement annuities, survivor benefits, disability benefits, and compensation during periods of unemployment and sickness.

    a.    Retirement annuities are essentially a pension, and employees vest for this pension after 5 years of railroad service. An employee's pension benefits increase after completion of 10 and 30 years of service. RRA retirement annuities are reduced by any other pension benefits an employee receives through their employer.

    b.    Survivor benefits are based on an employee's years of service and earning rate with the company. Widows of an employee may be eligible to receive 100% of the benefits that an employee was eligible for at retirement. Survivor benefits also provide payments for child support.

    c.    Disability benefits are similar to the benefits provided by Social Security Disability Insurance ("SSDI"). However, RRA disability benefits are on average higher than SSDI payments. In 2017, the average railroad worker received $2,920 a month in disability benefits through the RRA while disabled workers received an average of $1,295 per month through SSDI.

    d.    Unemployment and sickness benefits are short-term benefits financed exclusively by contributions of railroad employers. Employees are eligible for up to 130 days of compensation in a benefit year (maximum rate of $80 per day). If normal benefits are exhausted, employees with 10 or more years of service may receive an additional 65 days of compensation. Each employer pays contributions at a rate

which takes into consideration the employer's actual incidence of benefit usage. Under experience rating, employers whose employees have low incidences of unemployment and sickness pay contributions at a lower rate than employers with higher levels of benefit usage. In 2017, the basic tax rates on railroad employers, including covered commuter railroads, ranged from a minimum of 0.65 percent to a maximum of 12 percent.

55.     Employees of Transtar and the U.S. Steel Railroads were eligible to receive Tier I and Tier II benefits through the RRA, and the costs to maintain those benefits were extraordinarily high for the U.S. Steel Defendants; even higher when considering Senior Employees.

56.     In addition to the RRA benefits, employees of Transtar and the U.S. Steel Railroads were eligible for other, post-employment benefits paid for by the U.S. Steel Defendants, including health care, life insurance, and other pensions.

57.     The costs of providing all these benefits to employees of Transtar and the U.S. Steel Railroads was and remains a significant cost.

58.     From 2011-2014, U.S. Steel wrote in its 10-K Reports that the "[o]ur retiree health care and retiree life insurance plan costs, and our pension plan costs in the U. S. are higher than those of many of our competitors. These plans create a competitive disadvantage and negatively affect our results of operations and cash flows"

59.     In 2014, U.S. Steel stated in its 10-K Report that one of the key issues impacting U.S. Steel was "the level of unfunded pension and other benefit obligations."

60.     In 2020, U.S. Steel continued to note the expense of employing Senior Employees in its 10-K Report when it stated that "[w]e have significant retiree health care, retiree life insurance and pension plan costs, which may negatively affect our results of operations and cash flows."

61.     Nearly all the post-employment benefits that employees of Transtar and the U.S. Steel Railroads were eligible for had accrual rates based on years of service to the company.

62.     The U.S. Steel Defendants eventually focused on the rising costs of providing these post-employment benefits and identified ways to reduce these liabilities by preventing Senior Employees from reaching accrual milestones which, if reached, would provide them with increased post-employment benefits.

**Years of consecutive losses results in the extreme cost-cutting measures**

63.     In 2013, U.S. Steel Chief Executive Officer, Mario Longhi, hired David Burritt as Executive Vice President and Chief Financial Officer "with responsibility for all aspects of the company's strategic and financial matters."

64.     Longhi and Burritt devised a plan with consultants from McKinsey & Company called the "Carnegie Way."

65.     U.S. Steel touted the Carnegie Way initiative as "much more than a cost cutting initiative, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support."

66.     Today, the Carnegie Way plan is the focus of numerous shareholder derivative lawsuits which call Longhi's and Burritt's plan a sham and nothing more than a cost-cutting crusade.

67.     Former employees of the U.S. Steel Defendants, as identified as confidential witnesses in the aforementioned shareholder derivative lawsuits, have recently stated that as steel prices and manufacturing demand dropped in 2014, the Carnegie Way focused solely on cutting costs.

68.     Upon information and belief, there have been allegations made that McKinsey & Company urged managers to reduce any expense that could be isolated and measured. Bob Tita and Kris Maher, U.S. Steel, the Company That Built America, Faces Its Age, Wall Street Journal, December 15, 2019, 3:50pm, https://www.wsj.com/articles/u-s-steel-the-company-that-built-america-faces-its-age-11576443004.

69.     Managers throughout all of U.S. Steel's lines of business were required to come up with ideas for lowering expenses. See Id.

70.     The cost-cutting directives came from U.S. Steel's headquarters and urged the steel plants to get as much cost savings as possible. See Amended Complaint at ¶ 105 (Doc. No. 55) at 2:17-cv-00579, Varakas v. U.S. Steel Corp. et al, in the United States District Court of the Western District of Pennsylvania (Vrakas is one of the aforementioned shareholder derivative lawsuits).

71.     In 2015, the collapse of the steel industry resulted in the U.S. Steel Defendants enacting extreme cost-cutting measures under the guise of the Carnegie Way, which included paring down debt, enacting massive layoffs, and reducing U.S. Steel's employee obligations.

72.     As noted in the Vrakas Amended Complaint, individuals observed that during this period that if an employee was highly paid and had been with U.S. Steel for many years, the Company would find a way to "get rid" of them. Other individuals noted that U.S. Steel had a practice of getting rid of experienced, highly paid personnel and replacing them with inexperienced workers. See Id. at ¶ 128.

13

**C.      U.S. Steel Defendants are unable to reinvent themselves and resort to targeting Senior Employees as part of the Carnegie Way's extreme cost-cutting measures**

73.      In 2013, as part of the Carnegie Way's cost-cutting measures, managers at Transtar and Union Railroad began to target Senior Employees in the following ways:

a.      Terminating the employment of Senior Employees without following the applicable written disciplinary policies;

b.      Manipulating the applicable disciplinary policies to ensure that Senior Employees were issued a disproportionately higher number of demerits for the same or similar infractions that were committed by non-Senior Employees;

c.      Removing Senior Employees from service by issuing them more than 60 demerits (or more) for a single infraction that would typically be handled through verbal counseling or an informal warning;

d.      Forcing Senior Employees to sign "last chance" agreements (i.e., agreement in which any subsequent workplace infraction would result in the termination of employment) to ensure that procedural protections contained within applicable collective bargaining agreements and other contracts could not be raised by those Senior Employees; and/or

e.      Failing to remove prior demerits from the files of Senior Employees in a timely manner.

74.      These discriminatory, cost-cutting measures were controlled by U.S. Steel and Transtar executives and implemented on the ground by managers at the U.S. Steel Railroads.

75.      These discriminatory, cost-cutting measures were devised by U.S. Steel and Transtar executives to help the U.S. Steel Railroads from cutting expenses in other areas that might impact operations in a more harmful way.

76.      Malissa Sommers was Managing Director of U.S. Steel Logistics and President of Transtar during the relevant period of these claims. Sommers is now listed as Vice President of Process and Innovation for U.S. Steel.

77.      It is believed that Burritt, Carnes, and Sommers were among the U.S. Steel executives who helped to create and implement the Carnegie Way's cost-cutting measures that

targeted Senior Employees at Union Railroad and at other companies controlled by U.S. Steel and/or Transtar.

78.     It is believed that Carnes, Sommers, and other U.S. Steel and Transtar executives targeted Senior Employees for firing. These executives would rely on the General Superintendents of Union Railroad and other Transtar-related companies, to carry out these firings. At Union Railroad, the relevant General Superintendent was Joel Hudson.

79.     These General Superintendents carried out the Carnegie Way plan in similar ways. During weekly meetings, specific employees were discussed, and the General Superintendents assigned supervisors the responsibility of monitoring those targeted employees. The emphasis of these monitoring assignments was not to increase productivity, ensure safety, or otherwise improve the day-to-day performance of the companies, but rather, to find incidents where demerits could be assigned.

80.     Monitoring of Senior Employees involved surreptitious, around-the-clock-surveillance. For example, supervisors would often hide behind objects and monitor the targeted employees from a distance or at night. In other instances, supervisors would continually follow Senior Employees in company-issued trucks.

81.     Almost any incident could serve as the basis for issuing demerits. If a demerit-incident occurred, the targeted employee was immediately removed from service and pressured into signing a last chance agreement so that they would forfeit the use of any available grievance process. If the targeted employee refused to sign a last chance agreement, any exculpatory evidence that existed was often destroyed or go missing whenever a grievance hearing was held.

**Scott Stouffer's targeting and firing due to his age**

82.     Stouffer was born on June 5, 1977.

83.     On June 7, 2010, Plaintiff, Scott Stouffer, was hired by Union Railroad as a Brakeman.

84.     During his employment, Stouffer performed all the essential job duties of a Brakeman and performed them well.

85.     On March 22, 2017, Stouffer was working a scheduled 10-hour shift when his supervisor asked him to punch out early without explanation. Out of frustration, Stouffer muttered "jagoff" under his breath as he walked away to clock out. Although Stouffer immediately apologized, his supervisor reported the incident and Stouffer was removed from service later that night.

86.     The following week, Stouffer met with Union Railroad management and his union representative to address the incident. During that meeting, Union Railroad management told Stouffer he had two options: sign a last chance agreement or have a grievance hearing and get fired.

87.      Stouffer's union representative failed to defend him during this meeting and was unable to explain the company's insistence on using a last chance agreement (lasting for three years) for an employee with no prior work issues. As a result, Stouffer felt he had no other choice but to sign the last chance agreement.

88.     It is now believed that the company insisted on Stouffer signing a 3-year last chance agreement to ensure that he would never reach certain accrual milestones for post-employment benefits; accrual milestones Stouffer could only achieve if he remained employed as a Senior Employee.

16

89.     After signing the last chance agreement, Stouffer was assessed with 60 demerits for the incident. Younger employees were never issued a similar number of demerits for the same or a substantially similar incident.

90.     After the last chance agreement was executed, Stouffer was subjected to a hostile work environment where, among other things, he was micromanaged by his supervisor, subject to surreptitious surveillance, denied meal periods, refused headlamp batteries, and forced to work shifts that were not properly staffed. Younger employees were never treated in the same or a substantially similar way during the relevant period of these claims.

91.     On December 2, 2018, Stouffer was working on a train driven by a younger co-worker (under the age of 40) who caused the train to run through a switch. Stouffer was charged with multiple cardinal rule violations and immediately terminated. Conversely, Stouffer's younger co-worker, who was principally responsible for the violation, was assessed substantially less demerits and kept his job with Union Railroad.

92.     When Stouffer sought an explanation for his termination, Union Railroad cited the last chance agreement and refused to speak to him. Stouffer was also denied the opportunity to review his younger co-worker's statement about the incident.

93.     In a formal dismissal letter dated December 6, 2018, Union Railroad reminded Stouffer that his last chance agreement forbade him, or anyone acting on his behalf, from challenging his termination.

94.     Following the termination of his employment, the U.S. Steel Defendants intentionally interfered with Stouffer's access to his post-employment benefits

95.     At the time of his firing, Stouffer was 41 years old.

17

**Suppression of the scheme to target the Senior Employees**

96.     The U.S. Steel Defendants took action to ensure that all evidence of their discriminatory scheme to target Senior Employees would never be uncovered.

97.     The U.S. Steel Defendants began by manipulating existing disciplinary rules so that Senior Employees could be fired within the existing framework of applicable rules and procedures. For example, the use of last chance agreements was specifically and contractually limited to employees with substance abuse problems. Instead, the U.S. Steel Defendants began to use the last chance agreements to target Senior Employees.

98.     By using last chance agreements, the U.S. Steel Defendants had no obligation to preserve any documentation or exculpatory evidence before a Senior Employees was fired. Even when last chance agreements were not used, the U.S. Steel Defendants failed to preserve or even destroyed exculpatory evidence that could have prevented a Senior Employee from being fired.

99.     Next, the U.S. Steel Defendants worked with, pressured, and/or incentivized certain union leaders to dissuade their members not to pursue legal claims. On numerous occasions, whenever a Senior Employee was taken out of service, they were required to meet with a General Superintendent and other company managers. During those meetings, a union representative was present but often stayed silent while the company representative berated the Senior Employees and attempted to dissuade them from exercising their legal rights.

100.     Even when Senior Employees raised these and other issues with their respective unions, they were either told they had no legal recourse or denied any assistance.

101.     The unions also failed to apprise Senior Employees of potential statute of limitations issues, and there were numerous instances in which legal representatives of these unions told Senior Employees that they had no legal claims.

102.    Finally, the U.S. Steel Defendants retaliated against any employee who spoke out against this scheme. If a supervisor did speak out in support of a Senior Employee or reported company executives for targeting Senior Employees or other individuals, they were immediately fired.

103.    To this day, there are an untold number of individuals who are unaware that their employment with one of the U.S. Steel Defendants ended because they were targeted due to their status as Senior Employees.

**D.    Exhaustion of Administrative Remedies**

104.    On September 25, 2019, Stouffer filed an initial Charge of Discrimination against the U.S. Steel Defendants with the Equal Employment Opportunity Commission ("EEOC"), alleging a pattern and practice of age discrimination by the U.S. Steel Defendants.

105.    Stouffer was subsequently substituted in as Lead Plaintiff in this action against the U.S. Steel Defendants through filing of an Amended Complaint (Doc. No. 18) on April 17, 2020.

106.    The Amended Complaint (Doc. No. 18) was filed pursuant to 29 CFR § 1626.18(b) as more than 60 days had passed since Stouffer filed his Charge of Discrimination with the EEOC.

107.    As such, Stouffer has fully complied with all administrative prerequisites for the commencement of this action.

**COLLECTIVE ACTION ALLEGATIONS**

108.    Stouffer brings this case as an ADEA collective action pursuant to 29 U.S.C. § 216(b), on behalf of himself and all other Senior Employees who were targeted as part of the Carnegie Way's extreme cost-cutting measures, and whose employment was eventually terminated because they were 40 years or older.

109.     Collective treatment of Stouffer's ADEA claim is proper because Stouffer and other Senior Employees are "similarly situated" within the meaning of 29 U.S.C. § 216(b). A factual nexus exists between the manner in which Defendants' conduct affected Stouffer and the manner in which Defendants' conduct affected other Senior Employees.

110.     Accordingly, Stouffer's collective action claims derive from a single course of conduct by Defendants.  The objective facts are essentially the same for Stouffer and all other Senior Employees.  Within each claim for relief, the same legal standards under federal law govern.

## STATEMENT OF CLAIMS

### COUNT I
Violations of the Age Discrimination in Employment Act
(On Behalf of Plaintiff and Similarly Situated Individuals)

111.     Stouffer incorporates by reference the allegations in Paragraphs 1 through 110, as if fully set forth herein.

112.     Stouffer and other Senior Employees were over the age of 40 at the time their employment was terminated.

113.     Stouffer and other Senior Employees were able to perform the essential functions of their job at all relevant times.

114.     Defendant discriminated against Stouffer and other Senior Employees because it engaged in a pattern and practice of discriminating against individuals who were age 40 and older when it targeted Senior Employees as part of the Carnegie Way plan, and then fired Stouffer and other Senior Employees with the intention of replacing them with younger employees (i.e., employees under the age of 40).

20

115.    The acts and omissions by Defendants that are described in this Second Amended Complaint constitute unlawful discrimination under the ADEA.

116.    As a proximate result of Defendants' conduct, Stouffer and other Senior Employees have or will suffer substantial harm, for which they seek general, compensatory, and liquidated damages.

## COUNT II
Violations of the Age Discrimination in Employment Act
(On Behalf of Plaintiff and Similarly Situated Individuals)

117.    Stouffer incorporates by reference the allegations in Paragraphs 1 through 116, as if fully set forth herein.

118.    Stouffer and other Senior Employees were over the age of 40 at the time their employment was terminated.

119.    Stouffer and other Senior Employees were able to perform the essential functions of their job at all relevant times.

120.    Defendants' plan to cut operating costs is facially neutral because it purports to apply to all employees in a consistent and fair manner.

121.    Upon information and belief, Defendants' application and enforcement of its cost-cutting plan adversely impacted Stouffer and other Senior Employees in a statistically significant way.

122.    The disparity in which Stouffer and other Senior Employees' employment was terminated is a violation of the ADEA.

123.    As a proximate result of Defendants' conduct, Stouffer and other Senior Employees have or will suffer substantial harm, for which they seek general, compensatory, and liquidated damages.

## REQUESTS FOR RELIEF

Accordingly, Stouffer requests that this Court enter judgment on behalf of himself and other Senior Employees and enter an order directing the award of other relief, as follows:

A.      Declaring this action to be an ADEA collective action properly maintained under 29 U.S.C. § 216(b);

B.      Entering an order requiring the U.S. Steel Defendants to provide Stouffer with the names, dates of birth, length of employment, and last known contact information, including physical addresses, e-mail addresses, and telephone numbers of all Senior Employees whose employment ended from 2013 to present;

C.      Entering an order directing that notice and opportunity to opt-in be given to all former Senior Employees of the U.S. Steel Defendants whose employment ended from 2013 to present;

D.      Finding that Defendants violated the ADEA;

E.      Awarding Plaintiff and other Senior Employees back pay, front pay, lost benefits, and other emoluments of employment and such other relief as is necessary to make them whole;

F.      Awarding Stouffer and other Senior Employees liquidated damages under the ADEA;

G.      Awarding Stouffer and other Senior Employees attorneys' fees and costs;

H.      Awarding Stouffer and other Senior Employees pre- and post-judgment interest as provided by law; and

I.      Awarding Stouffer and other Senior Employees any other relief to which they are entitled and/or which this Court deems necessary and proper.

A jury trial is demanded for all claims triable by jury

Respectfully submitted,

/s/ Sammy Y. Sugiura
Sammy Y. Sugiura
PA I.D. No. 209942
ssugiura@cohengrace.com
Mark A. Grace
PA I.D. No. 78701
mgrace@cohengrace.com
COHEN & GRACE, LLC
105 BRAUNLICH DRIVE
SUITE 300
PITTSBURGH, PA 15237
TELEPHONE: (412) 847-0300
FACSIMILE: (412) 847-0304

**COUNSEL FOR PLAINTIFF**